IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Criminal Action No. 5:17-CR-28

WILLIAM PARR,

    Defendant.

# REPORT AND RECOMMENDATION

## I. INTRODUCTION

On August 8, 2017, the Grand Jury named Defendant in a four-count indictment. Count One of the indictment charges him with conspiracy to possess with intent to distribute and to distribute methamphetamine. Counts Two and Three charge him with distribution of methamphetamine. Count Four charges him with being a prohibited person in possession of a firearm. There is also a forfeiture allegation.

The Defendant filed two motions to suppress; one to suppress statements, and one to suppress evidence. The Court held a hearing regarding these motions on December 6, 2017. The Defendant appeared in person and by his counsel Kevin L. Neiswonger, Esq. The Government appeared through its counsel Robert H. McWilliams, Jr., Esq., and L. Danae DeMasi-Lemon, Esq. Lieutenant Shannon Huffman testified on behalf of the Government. The Defendant testified on his own behalf.

The Count is not persuaded by either of the Defendant's motions and recommends that they be denied.

1

## II.  FINDINGS OF FACT

On December 5, 2016, Defendant was pulled over by Lieutenant Huffman of the Tyler County Sheriff's Department. Lieutenant Huffman had known of, and dealt with, the Defendant for several years, including trying to convince him to work as an undercover informant in 2009. More recently, Lieutenant Huffman had developed a belief, through his own investigation and through conversations with other local law enforcement officers, that Defendant was currently involved in the distribution of methamphetamines.

On December 2, 2016, Lieutenant Huffman obtained a search warrant for Defendant's residence, and an RV on the same property based on information that had been collected in the investigation of the Defendant. For approximately a month leading up to obtaining the search warrant, Lieutenant Huffman had also been monitoring Defendant's travel via a GPS monitoring device on Defendant's vehicle pursuant to a court order. The device enabled Lieutenant Huffman to monitor the whereabouts of Defendant's vehicle on his phone.

On December 5, 2016, Lieutenant Huffman got an alert on his phone that the Defendant's vehicle had left the area it usually stayed within and traveled to Wood County, West Virginia. Lieutenant Huffman had information through his investigation that Defendant was involved in methamphetamine distribution with people near that area.

Throughout his investigation, Lieutenant Huffman was aware that Defendant's driver's license was revoked due to a felony DUI as he had checked on the status of Defendant's driver's license several times. When Defendant arrived back near his residence, which is near the edge of the city limits of Middlebourne, West Virginia, Lieutenant Huffman conducted a traffic stop of the Defendant. Although the stated reason for the stop was for driving with a revoked driver's license, Lieutenant Huffman chose this time to conduct the stop because the Defendant's unusual

travel that day made him suspicious of drug activity, and for the purpose of ultimately conducting a search of Defendant's residence and RV pursuant to the search warrant.

Lieutenant Huffman asked the Defendant where he had been. Based on the information he had from GPS monitoring of the vehicle, Lieutenant Huffman believed Defendant's answer to be a lie. Lieutenant Huffman then obtained a written consent from the Defendant to search the vehicle. After the search of the vehicle was complete, Lieutenant Huffman informed the Defendant that he had a search warrant for his residence, at which point the Defendant asked to speak to Lieutenant Huffman. The Defendant got into the passenger seat of Lieutenant Huffman's patrol car, and Lieutenant Huffman verbally mirandized him. They then spoke about the Defendant's drug related activity. They waited for a tow truck to arrive to tow Defendant's vehicle, then they proceeded to Defendant's residence to execute the search warrant.

Once in the residence, the Defendant told officers which bedroom was his. They found several firearms in the Defendant's bedroom. Lieutenant Huffman knew the Defendant was prohibited from possessing firearms as Lieutenant Huffman knew him to be a convicted felon. After searching the residence, Lieutenant Huffman proceeded to search the RV, where he found methamphetamine, marijuana, and drug paraphernalia.

Later that evening, the Defendant went with law enforcement officers to the sheriff's office where he was reminded of his *Miranda* warnings by Lieutenant Huffman. The Defendant proceeded to discuss his involvement in methamphetamine distribution. At some point during the conversation, Lieutenant Huffman also obtained written consent from the Defendant to search his phone. Defendant then went home. The following day, the Defendant came back to the sheriff's office. Lieutenant Huffman again mirandized the Defendant and the Defendant

signed a form acknowledging waiver of his *Miranda* rights. Defendant then gave a taped statement. Afterward, the Defendant again left the sheriff's office.

## III. DISCUSSION

The Defendant filed two motions to suppress. The Court is not persuaded by either. The Court addresses the motion to suppress evidence obtained as a result of the traffic stop in part A, and the motion to suppress statements in part B.

### A. Defendant's [ECF No. 27] Motion to Suppress Evidence

The Fourth Amendment of the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). In the context of vehicle stops, the "reasonable suspicion" standard applies. *See, e.g., id*; *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). Whether reasonable suspicion justified a traffic stop is viewed by the totality of the circumstances. *See, e.g., United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To meet this burden, an officer must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts," establish a reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 21. With this burden in

4

mind, "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). "Any ulterior motive a police officer may have for making the traffic stop is irrelevant." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). Additionally, under the collective knowledge doctrine, an officer may act on the instruction of another officer "if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." *United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011).

Lieutenant Huffman testified that at the time of the stop, the Defendant's vehicle was being monitored by GPS which Lieutenant Huffman could access on his phone. This was used to monitor where the Defendant went. Lieutenant Huffman further testified that Defendant had gone outside of the area he usually traveled within on the day in question. Furthermore, the area that the Defendant traveled to was near an area individuals lived that Lieutenant Huffman had information the Defendant was involved in the distribution of methamphetamine with. That, Lieutenant Huffman conceded, was the primary reason for the traffic stop on that day. Indeed, Lieutenant Huffman acknowledged that the proposed reason for the stop, Defendant driving on a revoked license, was pre-textual in nature. Lieutenant Huffman had known for some time about Defendant's license being revoked and had multiple chances to pull him over for it. That being said, "any ulterior motive a police officer may have for making the traffic stop is irrelevant." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011); *see also, Whren v. United States,*

517 U.S. 806, 810, 813–19, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," regardless of the officer's subjective motivations). That Lieutenant Huffman strongly suspected Defendant to be involved in the production and distribution of methamphetamine because of information obtained over the course of a months-long investigation, coupled with the Defendant's unusual travel that day may have been the true reason for the traffic stop, but Lieutenant Huffman's belief that the Defendant was driving on a revoked license gave rise to reasonable suspicion that a law was being broken. Thus, the traffic stop was valid.

Furthermore, even if Lieutenant Huffman had not had a valid reason to pull over the Defendant's vehicle because of a perceived traffic violation, reasonable suspicion still existed based on the Defendant's GPS activity that day. Specifically, that the Defendant had traveled to an area near where Lieutenant Huffman believed, by reason of his investigation, that the Defendant had contacts related to his distribution of methamphetamines. The Court believes that this information alone, without anything else, gave Lieutenant Huffman the reasonable suspicion needed to effectuate the traffic stop.

Additionally, Defendant argues that since Lieutenant Huffman did not have reasonable articulable suspicion for the traffic stop, the search of his residence and RV should also be suppressed. However, a search warrant for the residence and RV were issued several days earlier, and Lieutenant Huffman testified that the search warrant would have been served around that time with or without the traffic stop. Therefore, even if the traffic stop was found to be invalid, it would not follow that evidence found at the residence and RV as a result of the search warrant would also be inadmissible.

6

### B. Defendant's [ECF No. 26] Motion to Suppress Statements

When a subject is interrogated while in custody, a *Miranda* warning is required. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A court's "inquiry into whether an individual waived effectuation of the rights conveyed in the *Miranda* warnings has two distinct dimensions." *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002). Under *Cristobal*, a waiver of a suspect's *Miranda* warnings "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quotation marks omitted). Next, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation marks omitted). "In short, a waiver of Miranda rights must be voluntary, knowing, and intelligent." *United States v. Simmons*, 526 F. Supp. 2d 557, 564 (E.D.N.C. 2007). Under the preponderance of the evidence, the Government has the burden to show that the Defendant waived his *Miranda* rights. *United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005).

Here, Defendant does not deny that he was administered his *Miranda* warnings on multiple occasions over the two day period of December 5th and 6th, 2016. Indeed, the Government presented as evidence a form, signed by the Defendant, acknowledging administration of *Miranda* warnings prior to his conversation with law enforcement on December 6, 2016, the day Defendant gave his tape recorded statement. Rather, he argues that he was coerced into making statements to the police. Specifically, Defendant testified that at several points, he asked to speak to his attorney, and was told that if his attorney was contacted, he would be taken to jail, whereas if he agreed to speak with police without contacting his attorney, he would be allowed to go home to tend to his elderly parents to whom he is the

primary caregiver. Lieutenant Huffman testified that the Defendant never mentioned anything about contacting an attorney or mentioned his desire to do so.

The Court agrees that if the Defendant was forced at multiple junctures to make a choice between speaking to the police multiple times by himself and divulging information he did not want to divulge so that he could go home and care for his elderly parents for whom he is the primary caregiver, and calling his attorney, which would result in him being taken to jail and having no way to make sure his parents were taken care of, this would be extremely coercive and render the decision to speak with police non-voluntary. Therefore, this comes down to a he said, he said situation.

While the Court did not find either witness to be fully credible, Lieutenant Hoffman's testimony was the more credible of the two. Lieutenant Huffman testified that, while at the traffic stop, the Defendant specifically asked to speak with him. This claim was not rebutted by the Defendant. If Defendant did not want to tell police officers anything, as he testified, it would make little sense for him to ask to speak to Lieutenant Huffman. Furthermore, the Defendant did not contact his attorney between his interview on the night of December 5th, and giving his recorded statement on the afternoon of the 6th. Even if he was so worried about his parents that he felt he had to do whatever was required of him to get home to them on December 5th, he certainly had the opportunity to contact his attorney before going back to the sheriff's office the next afternoon. Even if he was worried about being detained at that time, he presumably had time to make sure his parents were taken care of while he was away. Therefore, the Court finds by a preponderance of the evidence that the Defendant was properly mirandized, and was not coerced into making statements without contacting an attorney.

## V. RECOMMENDATION

The Court **RECOMMENDS**:

1. The Defendant's [ECF No. 26] Motion to Suppress Statements be **DENIED**.

2. The Defendant's [ECF No. 27] Motion to Suppress Evidence be **DENIED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.

A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, the United States Marshal Service, and the United States Probation Office, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Dated: December 20, 2017  /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE